IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 18, 2002 Session

## CHARJORAY P. WEIR v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Wilson County**
**No. 98-1597    J. O. Bond, Judge**

_____

**No. M2002-00079-CCA-R3-CD - Filed December 30, 2002**

_____

The Petitioner was indicted for first degree murder. Pursuant to a plea agreement, he pled guilty to second degree murder, and received a sentence of fifteen years to serve in the Tennessee Department of Correction. The Petitioner then filed a petition for post-conviction relief, alleging that he was denied effective assistance of counsel resulting in an unknowing and involuntary guilty plea. The trial court dismissed the petition based on its untimely filing. However, our Court reversed that finding. The Petitioner filed an amended petition, and following an evidentiary hearing, the trial court denied the request for post-conviction relief. The Petitioner now appeals, arguing that the trial court erred by denying him post-conviction relief. Finding no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

Brody N. Kane, Lebanon, Tennessee, for the appellant, Charjoray P. Weir.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; Tom P. Thompson, Jr., District Attorney General; and Robert Hibbett, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

I. FACTUAL BACKGROUND

A. Guilty Plea Hearing

On January 22, 1999, the Petitioner pled guilty to second degree murder, and pursuant to the plea agreement, the trial court sentenced the Petitioner to fifteen years incarceration. At the plea hearing, the following dialogue transpired between the trial court and the Petitioner:

Q. Tell us your full legal name, Mr. Weir?
A. Charjoray P. Weir.
Q. Case number 98-1597. I'm looking at a Request for Acceptance of a Plea of Guilty, Petition to Waive Trial by Jury and to Waive an Appeal. Is that your signature on this document?
A. Yes, sir.
Q. Did you go over it and read it before you signed it?
A. Yes, sir.
Q. Did you talk to your lawyer about it?
A. Yes, sir.
Q. Do you have any questions you want to ask your attorney or to ask me about what you're doing here?
A. No, sir.
Q. Are you under the influence of any type of drug, medicine or anything?
A. No, sir.
Q. So you feel like you know what you're doing?
A. Yes, Sir.
Q. And is your plea of guilty voluntary?
A. Yes, sir.
Q. How old are you?
A. Twenty.

Following the above dialogue, the prosecution stated what it would attempt to prove if the case were taken to trial. The trial court then told the Petitioner that he did not have to plead guilty, that he had the right to a trial. The court also told the Petitioner that if the case were taken to trial, he would have the opportunity to cross-examine the State's witnesses and the right to subpoena his own witnesses. The Petitioner stated that he wished to waive his right to a trial and plead guilty. He maintained that he understood his sentence.

B. Post-Conviction Hearing

The following proof was presented at the hearing on the petition for post-conviction relief. Counsel who represented the Petitioner at the time of his guilty plea testified that she had worked for the public defender's office for three years. She recalled that during her time at the public defender's office, she only worked on one other homicide case besides the Petitioner's case. She testified that she had never taken a homicide case to trial. Counsel testified that in addition to working for three years in the public defender's office, she also was in private practice for a year. She stated that during her year in private practice, she only worked on one criminal case.

Counsel testified that she had reviewed the Petitioner's file prior to the hearing. She acknowledged that the Petitioner was indicted in October 1998. Counsel testified that she met with the Petitioner on December 11, 1998 at River Bend, but she could not recall how long the meeting lasted. She stated that at this first meeting, she obtained and took notes on "basic information"

regarding the offense resulting in the Petitioner's incarceration. Counsel did not recall if she met with the Petitioner again while he was at River Bend. Counsel testified that she thought she met with the Petitioner on another occasion, possibly at the jail. She testified that her notes indicated that she met with the Petitioner on at least two occasions prior to the court date.

Counsel testified that her notes indicated that on December 11, 1998 she discussed a plea offer with the Petitioner. She stated that she "must have talked to him quite a while because [they] would have talked about a lot of different things." Counsel testified that she was "sure that [she] must have" discussed the indictment with the Petitioner because that is her "standard procedure." She stated, "In fact I'm sure we probably did that the very first time we met, because what I would always do when I would meet with a client initially is, whether it was a complaint or indictment I would always . . . read it aloud to them and discuss with them what the charge was, what the state would have to prove against them, what the possible punishment would be, and I would usually . . . maybe discuss . . . what offer might come from the state."

Counsel testified that if she was preparing for a trial in a homicide case, there would be "an in-depth investigation of all the facts." However, she stated that such an investigation is not always necessary when a defendant wants to plead guilty. Counsel testified that she would refer cases to investigators rather than investigating herself. She stated that some of her notes in this case appeared to be "written either by Larry or Gary Mac" Foster. From her notes, counsel determined that Foster must have been with her at River Bend.

Counsel testified that she questioned the Petitioner about witnesses, and the Petitioner said that he thought the victim beat him with brass knuckles two weeks prior to the offense in this case. She stated that she had a list of witnesses as to the alleged brass knuckles beating and that Marcus Carey was one of those witnesses. Counsel acknowledged that there was nothing in her notes to indicate that any investigation was done regarding Carey, that any phone calls were made to Carey, or that any statement was taken from Carey. She testified that also on the list of witnesses were Kendra Bass, LaShelta Cason, Billy Clark, Ethel Neal, Betty Petty, and a boy named Booky or Bucky. Counsel stated that the name Lavoris Martin was in Gary Mac's notes. She testified that she could not find in her notes the name Maurice McGowan. Counsel testified that Latoya Anderson was also listed in her notes as a witness. She testified that she did not see anything in her notes that reflected that she had talked to any of the witnesses. Counsel testified, "The [D]efendant in this case pled so quickly we didn't prepare the case for trial."

Counsel testified that the Petitioner did not always want to plead guilty, but the Petitioner never told her that he wanted to go to trial. She testified that the Petitioner told her that the victim had a gun. Counsel agreed that there was a short time from the indictment until the guilty plea in this case. She stated that she did not confer with the attorney that represented the Petitioner in general sessions. According to counsel's notes, the Petitioner waived his right to a preliminary hearing. Counsel agreed that the Petitioner only had the benefit of what the State's case would be when making his plea and not the benefit of a preliminary hearing or any investigation from the public defender's office. She stated that she did not know if it would have been helpful for the

Petitioner to have had the benefit of investigators talking to some of the potential witnesses. Counsel acknowledged that she filed a motion for discovery, but she did not specifically recall any other motions.

Counsel did not recall discussing with the Petitioner options regarding suppressing his statement. She testified that it would have been part of her "normal procedure" to advise defendants of the elements of each charge, but she stated that she would not have necessarily documented that she did so. She testified that she did not speak to any witnesses regarding the brass knuckle incident. Counsel acknowledged that two guns and a knife were found in the victim's car, but she did not talk to anyone to verify how the guns got there. She testified that the Petitioner did not tell her about any threats that were made against him. Counsel testified that it would have been part of her "normal procedure" to talk to the Petitioner about the requirements of entering a knowing plea.

Counsel testified about her discussions with the Petitioner regarding his plea agreement. Although she could not recall exactly what was discussed, she stated the following:

> I would have gone over . . what kind of evidence [the State] had against him, what the [S]tate would have to prove and then I would explain to him . . . what the possible punishments for that was, if he went to trial and was found guilty. Then I would discuss the plea and everything having to do with . . . second degree murder . . . what he would be pleading to, the knowing killing of another. And that he would get the minimum of the range, fifteen to twenty-five. That the DA had offered the minimum of fifteen, but that . . . he would have to serve eighty-five percent of that before he would ever be considered for any type of parole.

She stated that although she could not recall, she was "sure [she] must have" discussed with the Petitioner how provocation and voluntary manslaughter would have affected the case.

Regarding the actual plea agreement, counsel stated that she always read the plea agreements to defendants and then asked them if they understood everything. She stated, "I never let anybody plead that didn't understand what they were getting themselves into." Counsel testified that she was "sure" she did legal research on the case. She could not recall how much time she spent on the case.

On cross-examination, counsel testified that she is an associate dean at the Nashville School of Law and that she had been there for a little over a year. She testified that she worked on "well over a thousand criminal cases" while she was at the public defender's office. Counsel stated that there was handwriting in the Petitioner's file other than her own. She stated that Gary Mac Foster probably helped with the Petitioner's case. She did not recall if Foster met with any of the witnesses in this case. Counsel testified that she discussed the possibility of a self-defense claim with the Petitioner.

Counsel testified that she was appointed to this case at the end of November 1998, and that she met with the Petitioner on December 11, 1998. According to counsel, the State made a plea offer shortly after her first meeting with the Petitioner. She noted that the Petitioner was originally charged with first degree murder, and the offer was for the Petitioner to plead to second degree

murder and serve fifteen years in prison. Counsel testified that the offer was presented to the Petitioner on January 15, 1999 in the Wilson County jail.

Counsel testified that it was the Petitioner's decision to accept the offer by the State and that she did not tell him to take the offer. She stated that she was willing to take the Petitioner's case to trial. Counsel did not recall the Petitioner saying that he did not understand anything about the plea agreement. She maintained that if the Petitioner had said that he did not understand the plea agreement, she would not have let him plead. Counsel testified that the Petitioner never indicated that he did not understand any part of the plea process or that he did not want to plead guilty. She did not recall that the Petitioner had any complaints about her not interviewing witnesses. She also did not recall any family members suggesting that the Petitioner not plead guilty. Counsel stated that all discovery was completed before the plea agreement.

Marcus Carey testified that he was a witness to the shooting in this case. According to Carey, he, the Petitioner, LaShelta Cason, and Kendra Bass were standing on the Petitioner's mother's front porch about to leave to go to the movies. He recalled that they then "saw [the victim] come up the hill in the projects." Carey testified that he knew that the Petitioner and the victim had been in a prior altercation, so he told the Petitioner that they should leave. He testified that they stopped at Bass's house and he and the Petitioner went inside so Carey could get a jacket and a "cold drink." Carey testified that when they came out of the house, he "heard Kendra saying something," so he told the Petitioner to "get in the car and don't even worry about it." He recalled that the "whole time" they were getting in the car, Bass "was doing some arguing or some talking to somebody down the street."

Carey testified that as he was trying to get in the car, the victim's mother "walked up the street" and Bass and Cason went inside the house. He stated that the next thing he knew, the Petitioner and the victim were arguing. Carey testified that the victim appeared to be "reaching for something or trying to grab [the Petitioner] or something like that." Carey testified that prior to the altercation, he had seen the victim in his car possibly looking for something. Carey stated that he heard a shot and looked up to see the victim walking down the sidewalk and the Petitioner and his uncle "fighting over the gun."

Carey testified that the Petitioner did not appear to be the aggressor in the situation. He stated that they "asked [the victim] nicely not to come up the street and when he came up the street that's when [the Petitioner and the victim] started arguing, and all this." Carey noted that the victim was bigger than the Petitioner and that the Petitioner was "scared" of the victim. On cross-examination, he testified that he never saw the victim with a weapon.

Kendra Bass testified that she had known the Petitioner for most of her life. She stated that she lived with her husband Marcus Carey. Bass testified that on the night of the offense, she, the Petitioner, Carey, and Cason were all getting ready to go out to eat. She recalled that the foursome stopped at her house "to get a coke." Bass reported that as they were entering the house, "words started going back and forth." She testified that the Petitioner and the victim were arguing and that

she said, "just leave us alone, don't nobody start shooting or whatever . . . ." Bass testified that she was unlocking the door to her house when she observed the victim walk to his car and go through his trunk. She reported that she went into the house and called 911. Bass testified that she did not go back outside.

Bass testified that she gave a statement to police. However, she stated that she was never contacted by anyone else for information about the incident. Bass testified that she would have been willing to talk about what she had observed. On cross-examination, Bass acknowledged that she did not witness the actual shooting. She also stated that she did not see the victim with a gun.

LaShelta Cason testified that on the night of the offense, she, the Petitioner, Carey, and Bass were all about to go out. She testified that she was dating the Petitioner at the time. According to Cason, before going out, they stopped at Bass's house to get something to drink. She stated, "We all got out of the car, [and] a conflict got started between [the Petitioner] and [the victim]." Cason testified that Bass went inside the house to call the police, and Cason followed her. She reported that it did not appear as if the Petitioner wanted to "start something" with the victim. Cason acknowledged that the victim was quite a bit bigger than the Petitioner.

Cason testified that she gave a statement to police, but was not contacted by defense counsel. She stated that she would have been willing to provide defense counsel with information about the incident. On cross-examination, Cason acknowledged that she did not actually see the shooting and that she did not see the victim with a weapon. She also stated that she did not see the Petitioner with a weapon. Cason testified that before the shooting, she saw the victim looking through his car.

The Petitioner testified that he was twenty-three-years-old at the time of the post-conviction hearing. He testified that another attorney represented him at the general sessions level. He stated that the first time he met counsel was while he was in River Bend. The Petitioner recalled that a man accompanied counsel to the prison. He testified that he tried to ask counsel about his case and the possibility of a self-defense argument. The Petitioner stated, the "only thing they kept telling me if I go to trial I'm going to get a life sentence and so I needed to take fifteen years at eighty-five percent. He recalled that he met with counsel for approximately an hour on that day. The Petitioner testified that he told counsel about potential witnesses and told her about a prior incident where the victim allegedly hit the Petitioner with brass knuckles.

The Petitioner testified that he also talked to counsel on the day that he accepted the plea agreement. He stated that the first time he appeared in court before Judge Bond was when he accepted the plea agreement. The Petitioner reported that the first time he heard of the offer was the day he accepted the plea agreement. He maintained that he did not meet with counsel between the visit at River Bend and when he pled guilty. The Petitioner stated that before he accepted the plea, counsel talked to him about the offer. However, he contends that he did not understand "because the only thing that was on [his] mind" was the thought that if he went to trial he was going to get a life sentence. The Petitioner testified that he continued to ask counsel about the possibility

of a self-defense argument. He testified that on the day he pled guilty, he spoke to counsel for about thirty minutes.

The Petitioner testified that he never saw the indictment. He stated that counsel did not explain to him how self-defense would work or the elements of voluntary manslaughter. The Petitioner maintains that he was never told that he could be convicted of a lesser offense if he proceeded to trial. He maintains that he would not have pled guilty if he had been informed that he might have been convicted of a lesser offense at trial. He stated that he did not believe he had any other options other than accepting the fifteen year plea agreement.

Regarding the night of the offense, the Petitioner testified that he, Cason, Carey and Bass were about to go out to dinner and the movies. He reported that the foursome was at his mother's house when they saw the victim drive "up the hill." The Petitioner stated that the foursome went to Bass's house to get something to drink. According to the Petitioner, when they came outside, the victim's mother began telling the Petitioner that he should have left her son alone. The Petitioner testified that Carey told him to get in the car. He stated that he was going to get in the car, but the victim and his mother kept walking towards him. The Petitioner reported that he said something to the victim which "got him hot." He reported that he stepped out into the street and was surrounded by the victim, the victim's mother, and the victim's uncle.

The Petitioner testified that they were "having words" when he saw the victim "reach for a gun." He stated that he believed that his actions were taken in self-defense. The Petitioner testified that he saw the victim's nephew "Bookie" pick up the victim's gun and leave after the shooting. He testified that "nobody [was] interviewed about nothing." He maintained that he was not advised regarding lesser-included offenses and what the State had to prove in his case. He also stated that counsel did not review the range of punishment that he could face. When asked if he made a knowledgeable choice to plead guilty, the Petitioner stated, "I was scared, sir. I was scared because I didn't want to get no life sentence. I had two kids I had to get home to, so I took the fifteen, what they was telling me to take." He testified that he did not feel like counsel properly represented him. The Petitioner reported that he did not have the benefit of knowing what the witnesses would testify to at trial or the benefit of any investigation by the defense.

On cross-examination, the Petitioner acknowledged that he shot the victim but claimed it was in self-defense. He agreed that none of the witnesses that testified at the post-conviction hearing saw the victim with a weapon. The Petitioner viewed in court a copy of the plea agreement. He acknowledged that it was signed on January 15, 1999. He also acknowledged that he pled guilty on January 22, 1999. The Petitioner then tried to say that he pled guilty on the same day that he signed the agreement. He stated that if he did sign on a different day, he did "not remember seeing it."

The Petitioner admitted that when he pled guilty, he told the trial court that he understood the plea agreement. However, he testified that he had problems reading the document and only plead because counsel informed him that otherwise he would be facing life imprisonment. He testified that he told the trial court that he had read the document because he was "scared." The Petitioner also

admitted that he told the trial court that he had talked to counsel about the plea agreement. The Petitioner acknowledged that he told the trial court that he did not have any questions regarding the plea agreement. The Petitioner stated, "At the time I guess I knew what I was doing, I took the fifteen, it wasn't no life sentence." He also stated that his plea "was voluntary with the evidence [he] knew."

On re-direct, the Petitioner testified that he told the trial court that he read the plea agreement because he did not want anyone to know that he could not read. The Petitioner testified that counsel "read it back there and told [him] what [he] had to do on it and stuff." He stated that he was aware that he might have been convicted of a lesser-included offense but then stated that he did not know that at the time.

## II. ANALYSIS

The Petitioner argues that due to ineffective assistance of counsel, he did not enter a voluntary and knowing guilty plea. Specifically, he contends that he was not properly advised as to the evidence against him and the option of proceeding to trial and asserting that he had acted in self-defense. In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. Tenn. Code Ann. § 40-30-203. The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. Id. § 40-30-210(f). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which is overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. Id. at 457. The Tennessee Supreme Court has held that the issue of ineffective assistance of counsel is a mixed question of law and fact and, as such, is subject to de novo review. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution. Id.; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). This right to representation includes the right to "reasonably effective" assistance. Burns, 6 S.W.3d at 461. In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. Baxter, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness," Strickland v. Washington, 466 U.S. 668, 688 (1984), and that this performance prejudiced the defense, resulting in a failure to produce a reliable result. Id. at 687; Cooper v. State, 849 S.W.2d 744, 747 (Tenn.1993). To satisfy the requirement of prejudice, a petitioner must show a reasonable probability that, but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding the petitioner's guilt. Strickland, 466 U.S. at 695. This reasonable probability must

be "sufficient to undermine confidence in the outcome." Id. at 694; see also Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994).

This standard also applies to claims arising out of the plea process. Hill v. Lockhart, 474 U.S. 52, 58 (1985). To satisfy the requirement of prejudice in a case involving a guilty plea, the petitioner must demonstrate a reasonable probability that, but for counsel's errors, he or she "would not have pleaded guilty and would have insisted on going to trial." Id. at 59.

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. Strickland, 466 U.S. at 690; State v. Mitchell, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. Strickland, 466 U.S. at 690; Cooper, 849 S.W.2d at 746; Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462. Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. Williams v. State, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980).

In order to satisfy constitutional standards, a plea of guilt must be entered knowingly, voluntarily and intelligently. See Boykin v. Alabama, 395 U.S. 238, 243 (1969). This includes an intentional relinquishment or abandonment of known constitutional rights, including the right against compulsory self-incrimination, the right to confront witnesses, and the right to a trial by jury. Bates v. State, 973 S.W.2d 615, 624 (Tenn. Crim. App. 1997). "'[T]he standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" Powers v. State, 942 S.W.2d 551, 556 (Tenn. Crim. App. 1996) (quoting Alford, 400 U.S. at 31). "When a competent petitioner knowingly and voluntarily chooses a lawful course of action or defense strategy, counsel is essentially bound by that decision." Zagorski v. State, 983 S.W.2d 654, 658-59 (Tenn. 1998).

In determining whether the petitioner's guilty pleas were knowing and voluntary, this Court must look at the totality of the circumstances. State v. Turner, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995); Chamberlain v. State, 815 S.W.2d 534, 542 (Tenn. Crim. App. 1990). In doing so, we may review any relevant evidence in the record, including the post-conviction proceedings. Turner, 919 S.W.2d at 353.

> [A] court charged with determining whether [the] pleas were "voluntary" and "intelligent" must look to various circumstantial factors, such as the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993).

In this case, the post-conviction court concluded that the Petitioner received effective assistance of counsel and that he consequently entered his pleas knowingly and voluntarily. The record indicates that before accepting the Petitioner's guilty plea, the trial court asked the Petitioner if he read his plea agreement, if he talked to counsel about the plea, and if he understood his plea. The Petitioner responded affirmatively to these questions. The Petitioner was then informed of the State's factual allegations and his right to a trial. The Petitioner maintained that he understood his sentence and pled guilty.

We find nothing in the record to indicate that the trial court erred in finding that counsel was effective and that the Petitioner's guilty plea was entered knowingly and voluntarily. According to the trial court, there is nothing unusual about a lawyer not writing everything that is said to a defendant in his or her notes. The trial court stated that the Petitioner appeared to have understood his plea agreement. Although counsel could not specifically recall some of her conversations with the Petitioner, she maintained that it was her normal procedure with defendants to read the indictment, discuss the charges, discuss what the State would have to prove, and discuss possible punishments. She also testified that in the case of plea agreements, she would always go over the plea agreement with the defendants and make sure that they understood what everything meant. We agree with the trial court that there is nothing in the record to indicate that counsel was deficient in this case or that the Petitioner's plea was not entered knowingly and voluntarily.

Accordingly, the judgment of the trial court is AFFIRMED.

_____
ROBERT W. WEDEMEYER, JUDGE

-10-